ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

MODESTO ECHEZARRETA,

     Plaintiff,

     vs.

JOANNA KEMMEREN, ROGER DAVY,
JEFFERY ODENTHAL, IVAN VALDIVIESO,
BENITO RODRIGUEZ, CHERYL CERVANTES,
CHRIS BARNHART, JAMES MARTENS,
DARRELL ROBBINS, DANIEL ROBICHAUD,
sued in their individual capacities,
and NEDRA CHANDLER, CURTIS O'NEIL,
MARY HENRY, AMBER ALLEN, JENNIE BRAUER,
JOYCE PALMER, LAWRENCE NGU, ARTHUR FUNK,
ARTHUR APPLEYARD, RICHARD SHUTE, RAJENDER
DAHIYA, SHERRY BENTON,
WEXFORD HEALTH SOURCES. Inc., sued in their
individual and official capacities.

     Defendants.

**RECEIVED**

APR 16 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Case No. **10 C 50 0 92**

*Judge Kapala*

JURY TRIAL DEMANDED

CHECK ONE ONLY:

   X     COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
          U.S. Code (state, county, or municipal defendants)

         COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
         28 SECTION 1331 U.S. Code (federal defendants)

         OTHER (cite statute, if known)

I. **Plaintiff**

    A.    Name: MODESTO ECHEZARRETA

    B.    List all aliases: None

    C.    Prisoner Identification Number: K72007

    D.    Place of Present Confinement: Dixon Correctional Center

    E.    Address: 2600 N. Brinton Ave., Dixon, Illinois 61021


II. **Defendant(s):**

    A.    Defendant: NEDRA CHANDLER

        Title:    Chief Administrative Officer – WARDEN

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

    B.    Defendant: CURTIS O'NEIL

        Title:    Assistant Warden of Programs

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

    C.    Defendant: CHRIS BARNHART

        Title:    CCII – Grievance Officer

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

    D.    Defendant: MARY HENRY

        Title:    Health Care Unit Administrator (2008-2009)

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

    E.    Defendant: JAMES MARTENS

        Title:    CCII – Grievance Officer

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

    F.    Defendant: CHERYL CERVANTES

        Title:    CCIII – Adjustment Committee Hearing Member

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

G.      Defendant: BENITO RODRIGUEZ

        Title:    CCII – Adjustment Committee Hearing Member – Counselor

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

H.      Defendant: JOANNA KEMMEREN

        Title:    Leutenant – Adjustment Committee Hearing Chairperson

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

I.      Defendant: DARRELL ROBBINS

        Title:    Correctional Officer

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

J.      Defendant: DANIEL ROBICHAUD

        Title:    Correctional Officer

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

K.      Defendant: IVAN VALDIVIESO

        Title:    Correctional Sergeant – Adjustment Committee Hearing Chairperson

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

L.      Defendant: LAWRENCE NGU

        Title:    Doctor – _____

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

M.      Defendant: ARTHUR APPLEYARD

        Title:    Doctor – _____

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

N.      Defendant: ARTHUR FUNK

        Title:    Doctor – _____

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

O.      Defendant: RAJENDER DAHIYA

        Title:    Doctor – _____

        Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

P.    Defendant: RICHARD SHUTE

    Title:    Doctor –

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

Q.    Defendant: AMBER ALLEN

    Title:    Nurse - Director of Nursing (2009 - Present)

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

R.    Defendant: JENNIE BRAUER

    Title:    Nurse - Director of Nursing (2006–2009)

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

S.    Defendant: ROGER DAVY

    Title:    Correctional leutenant at the time of issue;
            NOW: Correctional Major

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

T.    Defendant: JEFFERY ODENTHAL

    Title:    Correctional Officer / Hearing Committee Menber

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

U.    Defendant: JOYCE PAIMER

    Title:    Health Care Unit Administrator (2009–2009)

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

V.    Defendant: SHERRY BENTON

    Title:    Administrative Review Board Member – Grievance

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021
                       1301 Concordia Ct., Springfield IL 62794

W.    Defendant: ANDREAS   MESROBIAN

    Title:    Doctor

    Place of Employment: 2600 N. Brinton Ave., Dixon, IL 61021

X.    Defendant: WEXFORD  HEALTH SOURCE, Inc.

    Title:    Health Service Provider – Contract – Doctors Employer

    Place of Employment: 425 Holiday Dr., Forter Plaza Two, Pittsburg, PA
                                      15220

III.   **Exhaustion of Administrative Remedies:**

   A.   Is there a grievance procedure available at your institution?

   YES (X)  NO ( )

   B.   Have you filed a grievance concerning the facts in this complaint?

   YES (X)  NO ( )

   C.   If your answer is YES:

   1.  What steps did you take:

   Plaintiff first addressed the issues with his counselor. Plaintiff
   then appealed to the Grievance Officer, spoke to a number of
   staff members in the administration, and had an attorney and a State
   Representative's Office call the administration on Plaintiff's
   behalf. Plaintiff lastly appealed to the administrative review board.

   2.  What was the result?

   All the grievances were denied with the exception of one that was
   granted, and another one was ruled mixed. Yet the issues continued
   and the defendants did nothing to correct or resolve the violations.

   3.  If the grievance was not resolved to your satisfaction, did you
   appeal?  What was the result?

   Yes. Plaintiff did appeal to the administrative review board; yet
   the grievances were denied with the exception of one being granted
   and the other one ruled mixed.

   D.   If your answer id NO, explain why:

   E.   Is the grievance procedure now completed? YES (X)  NO ( )

   F.   If there is no grievance procedure is the institution, did you
   complain to authorities? YES ( )  NO ( ) N/A (X)

   G.   If your answer is YES:

   1.  What steps did you take?  N/A

   2.  What was the result? N/A

H.      If your answer is NO, explain why not: N/A

**IV.    List ALL lawsuits you have filed in any state or federal court:**

A.      Modesto Echezarreta Jr. vs. Deborah Roberts, 04 C 6459

B.      Filed October 30, 2004

C.      Defendants: Deborah Roberts, Robert Catchings, Jackie Miller, Sandra Hawkins, Jesse Montgomery, Roger Walker, Donald Snyder, Briley, Lemke, Cannon, and Slaughter.

D.      Filed in U.S. District Court, Northern District of Illinois, Eastern Division.

E.      Judge Assigned: Honorable Judge William T. Hart

F.      Claim: Tampering, Destroying, and Opening Legal Mail; Retaliation.

G.      Disposition: Settlement between the parties

H.      Approximate date of disposition: November 2005


A.      Modesto Echezarreta vs. Nedra Chandler, 2007 C 50210

B.      Filed October 2007

C.      Defendants: Nedra Chandler, Chris Barnhart, Sherry Benton

D.      Filed in U.S. district Court, Northern District of Illinois, Western Division

E.      Judge Assigned: Honorable Frederick J. Kapala

F.      Claim: Second Hand Smoke, Deliberate Indifference

G.      Disposition: Settlement between the parties

H.      Approximate date of disposition: November 2008


A.      Modesto Echezarreta Jr. v. State of Illinois and Illinois Department of Corrections, 02 CC 4356

B.      March 18, 2002

C.      N/A

D.    State of Illinois and Illinois Department of Corrections

E.    Illinois Court of Claims, Springfield, Illinois

F.    Commissioner LaGuina Clay-Clark

G.    Injury due to slip & fall on wet floor, negligence

H.    Claim denied

I.    2004

V.    **Statement of Claims:**

State here as brief as possible the facts of your case. Describe precisely how each defendant is involved. Include also the names of the persons involved, dates, and places. **Do not give any legal argument or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

**<u>Deliberate Indifference - Cruel and Unusual Punishment - RETALIATION</u>**

1.    On or about April 14, 1994, Plaintiff was arrested by the Chicago Police Area 5 Detectives. Following the arrest, Plaintiff was taken to Area 5 Police Station, where Plaintiff was beaten viciously by several detectives for a period of three days in their attempts to elicit a confession from Plaintiff. As a result of the beatings, Plaintiff suffered injuries to his Lower Back, in addition to other areas of the body.

2.    In 1998, after years of complaining from the pain to the back, the doctors at Cermak Health Services at the Cook County Jail ordered a CT Scan. From the CT Scan, it was determined that Plaintiff had injuries to the discs in the Lower Back, and some pain medication was prescribed. Sometime soon thereafter, Plaintiff was transferred tothe Illinois Department of Corrections Prison System.

3.    On March 04, 2002, after years of constant pain to the Lower Back and complaining, the Medical Director at Stateville C.C., Dr. Kevin Smith, ordered that Plaintiff be writ to UIC Hospital for an MRI. By this MRI, it was determined and confirmed that Plaintiff had **herniation, degenerative changes, large generalized disc bulging, and spinal stenosis to the L3-4, L4-5, and L5-S1 discs with compression of the right nerve root at the L5-S1.**

4.    Between the period of March 2002 through February 2004, Plaintiff was held at the Stateville C.C.. During this time period, Plaintiff was writ on many occasions to UIC Hospital to the Neurosurgery, Pain Services, and MRI Clinics. The recommendations/orders given by the doctors at the UIC Hospital Clinics were

always followed by Dr. Smith at Stateville C.C., and as a result, Plaintiff's pain to the lower back was being kept controlled to a bearable point.

5.     In addition to the lower back condition, plaintiff has also suffered for years from sharp pain to the bottom of his feets. After several visits to the Podiatry doctor at Stateville C.C., the doctor determined that Plaintiff had a condition that required special shoes.

6.     On May 12, 2003, the Podiatrist at Stateville C.C., Dr. Vohra, fitted and ordered special medical shoes for Plaintiff.

7.     On July 21, 2004, while at the Hill Correctional Center, following the orders of the prison doctor, Plaintiff was seen by American Prosthetic who after examining PLaintiff then ordered special medical shoes for Plaintiff with heel lifts. At that appointment, the examiner informed Plaintiff that if the ordered heel lifts and shoes were not successful that they would then measure Plaintiff and have some custom shoes made.

8.     At one point during the summer days of 2005, PLaintiff suffered an accident while walking the recreational yard at the Hill Correctional Center. There was a hole on the ground covered by the grass causing the hole not to be seen, and Plaintiff accidently stepped into the hole with his right foot while his body fell forward. Plaintiff immediately began to feel sharp pain to the right ankle and it got very swollen. Plaintiff was taken to the Health Care Unit at the facility and X-rays were done; yet Plaintiff was told that there were no fractures or broken bones.

9.     On September 28, 2005, Plaintiff was again seen by an examiner from American Prosthetic. This visit was per the medical policy that the medical shoes were to be reordered once a year. During this visit, due to the examiner noticing that Plaintiff was in serious pain to the right ankle, Plaintiff was told by the examiner that Plaintiff needed to be seen by an Orthopedic Surgeon due to possible problem

with the right ankle joint, and that she would make such notes in Plaintiff's medical files. At that time, the examiner fitted and measured Plaintiff for special custom molded orthopedic shoes.

10.     In November 2005, Plaintiff was scheduled to the Health Care Unit to receive the custom molded shoes that had been ordered on 09/28/05. Upon trying the shoes on, it was realized that a mistake had been made regarding the shoe size, and a size 11 had been made instead of a size 13 which is what Plaintiff wears. The examiner took the shoes back and stated that they needed to make new ones of a size 13; and that Plaintiff would be called back to the Health Care Unit once the shoes arrived.

11.     On January 11, 2006, Plaintiff was transferred from the Hill Correctional Center to the Dixon Correctional Center, prior to receiving the special ordered custom molded medical shoes that had been ordered as indicated in paragraphs 9 and 10.

12.     Since Plaintiff's arrival at the Dixon Correctional Center on 01/11/06 to the present date, PLaintiff informed every doctor that has treated him at the facility that Plaintiff needs medical shoes and that some had already been ordered while at Hill C.C.. Plaintiff first asked if they could have those shoes shipped to Dixon C.C. so that Plaintiff could wear them, yet has always been told that that would not be possible. Plaintiff has then asked could he then be seen by a podiatrist so that he could examine Plaintiff and order the shoes if he determined Plaintiff needs them; yet the doctors at Dixon C.C. would always respond that they do not have a podiatry clinic here at the facility nor could they send me to one.

13.     On October 31, 2006, after constant complaints of severe pain and suffering to the lower back and right ankle, Plaintiff was writ to UIC Hospital by order of the prison Medical Director, Dr. Lawrence Ngu, for an MRI. Yet this MRI was only for the Lower Back.

14.     From Plaintiff's arrival at Dixon C.C. in January 2006, until April 2008,
Plaintiff was seen and treated by Defendant Dr. Ngu at least twice a month regarding
Plaintiff's lower back and the severe pain to Plaintiff's right ankle. During
this entire period of time, Defendant Dr. Ngu prescribed several pain medications
to Plaintiff to relieve the pain to the lower back, and he had Plaintiff writ
to UIC Hospital for MRI's, to see the Neurosurgeon, and to the Pain Clinic for
Epidural Injections to the lower back. Yet, throughout all this period of time,
every time Plaintiff asked Defendant Dr. Ngu as to when was Plaintiff going to
see the Podiatry Clinic or an Orthopedic doctor to be treated for the severe pain
to the feet and right ankle; Defendant Dr. Ngu would always respond that he was
waiting for Defendant Dr. Funk's approval in order to have me seen by one of those
clinics at UIC Hospital.

15.     As indicated in paragraph 14, Plaintiff was writ on a number of occasions
to UIC Hospital Pain Clinic to receive Epidural Injections to the lower back for
the severe and excruciating pain. During such visits, the doctors at the Pain
Clinic Department made recommendations/orders that Plaintiff was to receive
Physical Therapy to the lower back; have an MRI made to the right ankle; be seen
by an Orthopedic Surgeon to diagnose and treat the right ankle; and not to walk
long distance due to the severe pain to right ankle and feet which caused Plaintiff
great difficulty to walk.

16.     It should be noted at this time that during this same period of time
indicated in paragraph 14 above, any time Plaintiff had to go to the chow hall
for his meals or to the health care unit for his medications, which was three
times a day to each location, Plaintiff was forced to walk a distance of an
approximately two blocks each way. When you add the two blocks each way three
times a day to each separate location, you can see that Plaintiff was forced to
walk approximately 24 blocks a day under severe and excruciating pain. This was

in spite of Plaintiff's constant complaints to the doctors, nurses, officers, and Administration at the facility informing then that Plaintiff was suffering excruciating pain every time he was forced to go walking to those locations for such long distances; yet the complaints kept falling on death ears.

17.     On August 28, 2007, Plaintiff had an appointment with Defendant Dr. Ngu. At this appointment, after seeing Plaintiff in great pain and suffering and complaining from the severe and excruciating pain to the back and ankle, and hardly being able to walk; Defendant Dr. Ngu made an recommendation/order that Plaintiff may be transferred to the health care unit 3rd floor. The health care unit 3rd floor is permanent housing for inmates that have difficulty walking long distances or have a medical condition that requires minimal walking distances.

18.     On September 27, 2007, Plaintiff had another appointment with Defendant Dr. Ngu concerning Plaintiff's lower back and right ankle conditions. At this appointment, after Plaintiff complaining of excruciating pain and suffering to the lower back and right ankle, and telling Defendant Dr. Ngu that Plaintiff could hardly walk due to the severe pain, Defendant Ngu indicated to Plaintiff that once again he would recommend/order that Plaintiff be moved to the health care unit 3rd floor where the medication and meals would be provided on-site, and that would limit the walking of long distances and possibly alliviate some of Plaintiff's pain. Furthermore, Defendant Dr. Ngu also informed Plaintiff that he would make another note in the record that Plaintiff was to be seen by Neurosurgery for the back and Ortho for the ankle; but that Defendant Dr. Funk was refusing to approve the Ortho appointment. That all he – Defendant Dr. Ngu – could do was to make a note in Plaintiff's medical file.

19.     On October 23, 2007, Plaintiff was writ to UIC Hospital Pain Clinic for an Epidural Injection to the lower back for the pain. At this visit, the doctors at the Pain Clinic recommended/ordered that Plaintiff was not to lift any weights

12

or heavy objects in the standing position, and that Plaintiff was not to walk
long distances but instead only have limited short walks.

20.     On October 25, 2007, Plaintiff was sent to the health care unit for an
unrelated issue. During this visit, the nurse performing the vitals on Plaintiff,
Nurse Young, observed that Plaintiff was in great pain and having difficulty walking.
After Plaintiff explaining to her why Plaintiff was in so much pain, nurse Young
then looked inside of Plaintiff's medical records. Nurse Young then explained
to Plaintiff that per the doctors at UIC, Plaintiff was not to lift any weights
nor be walking. Plaintiff explained to nurse Young that he was aware of the doctors
orders and that even the Medical Director at the prison, Defendant Dr. Ngu, had
ordered that Plaintiff be moved to the health care unit 3rd floor; but that such
orders were not being followed. Nurse Young then replied that Defendant Warden
Chandler had denied such medical recommendations that Plaintiff be housed in the
health care unit's 3rd floor.

21.     On October 26, 2007, Plaintiff filed an emergency grievance due to being
in severe excruciating pain not being able to hardly walk. In such grievance
Plaintiff addressed an additional unrelated matter.

22.     On October 30, 2007, Plaintiff's friend, Diana M. Rodriguez, contacted
Defendant Warden Chandler sometime in the morning to midmorning hours, and complained
to her about Plaintiff's need to see a doctor due to Plaintiff being in serious
excruciating pain. Late this afternoon, Plaintiff was called to the Control Booth
in his housing unit by the assigned officer, and instructed that per Defendant
Warden Chandler, Plaintiff was to go immediately to the health care unit and see
Defendant Dr. Ngu. Upon arriving at the health care unit and after seeing Plaintiff
in such severe and excruciating pain, Defendant Dr. Ngu gave two separate injections
to Plaintiff's thigh and informed Plaintiff that the shots were to relieve the
pain. Defendant Dr. Ngu then informed Plaintiff that Defendant Warden Chandler

13

was waiting for him in his office and that he was going to have a meeting with her
concerning Plaintiff's medical condition and the recommendations/orders issued
by doctors who were more specialized in those areas than he was. A couple of
hours later, Defendant Dr. Ngu returned to the examination room where he had
Plaintiff lying down in, and he informed Plaintiff that he had convinced Defendant
Warden Chandler into allowing Plaintiff to be housed in the health care unit;
but that she refused to approve Plaintiff for the third floor placement and instead
approved the second floor placement on the handicap side. Plaintiff replied to
him that it didn't matter where they housed him as long as Plaintiff didn't have
to walk such long distances and the pain could be controlled. Defendant Dr. Ngu
then explained to Plaintiff that though the facility did not have a physical
therapist on site, he would authorize for Plaintiff to use some of the physical
therapy equipment that they had in a gym area on the second floor of the health
care unit. Defendant Dr .Ngu further explained that he was authorizing that if
Plaintiff needed to go to any long distance location that a wheelchair would
be provided to prevent unnecessary excruciating pain and suffering.

23.     From October 30, 2007 until May 02, 2008, Plaintiff was housed on the
second floor of the health care unit per the Medical Director's order who was
Defendant Dr. Ngu. During that period of time, in combination with the several
pain medications prescribed by Defendant Dr. Ngu and reapproved by the doctors
at UIC Hospital Pain Clinic, Plaintiff's use of the physical therapy equipment,
and of a wheelchair when traveling long distances, PLaintiff benefitted greatly
to where the pain and suffering was lowered and was becoming more bearable...to
the Lower Back condition. As for the pain tot he right foot and ankle, the pain
was minimized during the traveling periods by the use of a wheelchair for traveling.
The meals and medications were provided there inside the health care unit, so
Plaintiff did not undergo excruciating pain and suffering to the right foot and
ankle as severely due to not having to walk so many blocks as before.

23A.     On November 28, 2007, Plaintiff was writ to UIC Hospital Pain Clinic
for an Epidural Injection to the Lower Back. At this visit, the doctors again
recommended/ordered that Plaintiff was not to walk long distances. They stated
that extensive walking irritated the nerve roots and Plaintiff would benefit
from less walking.

24.     On March 12, 2008, during one of Defendant Dr. Ngu's rounds on the 2nd floor
of the health care unit, Plaintiff had an opportunity to speak with him.

PLaintiff and Defendant Dr. Ngu spoke for a few minutes in front of the 2nd floor
Control Booth prior to Defendant Dr. Ngu entering the Infirmary Area. During this
conversation, Defendant Dr. Ngu informed Plaintiff that he had spoken with Defendant
Dr. Funk explaining to him about Plaintiff's serious need to be seen by an Ortho
doctor, and that he had convinced Defendant Dr. Funk to approve the request. He
then indicated that he had ordered for Plaintiff to be scheduled for an appointment
with the UIC Hospital Ortho Clinic.

25.     Sometime in the month of April 2008, Defendant Dr. Ngu walked out of
the prison and never again returned.

26.     It should be noted at this time that during the period of approximately
July 2007 through March 2008, Defendant Warden Chandler not only worked as the
prison Warden, but she also held the position of Acting Health Care Unit Administrator.
This is why during the period indicated in paragraphs 17 and 18 above, she had
the full and complete authority to deny Defendant Dr. Ngu's orders that Plaintiff
be housed on the 3rd floor of the health care unit.

27.     It should be noted at this time that during the period indicated above
of January 2006 through April 2008, at no time did Defendant Dr. Ngu have Plaintiff
given an MRI to the right ankle, seen by a Podiatry or Orthopedic doctor, nor
at the least provided with the custom molded special ordered medical shoes that
had been ordered while Plaintiff was at Hill Correctioanl Center. At the least
Defendant Dr. Ngu could have made a phone call and had the shoes shipped to Dixon
Correctional Center.

28.     On May 01, 2008, Plaintiff was issued a call pass for an appointment
with Defendant Dr. Funk, for 1:15pm. Once called inside to see Defendant Dr.
Funk, Plaintiff entered the examination room where he was greeted by Defendant
Dr. Funk and informed that he was temporarily doing Defendant Dr. Ngu's call
line. Defendant dr. Funk indicated to Plaintiff that he was there for a "Placement
Evaluation" and asked Plaintiff to give him a brief history of Plaintiff's medical

history. After Plaintiff giving Defendant Dr. Funk a history of his medical conditions, and Defendant Dr. Funk reviewing Plaintiff's medical records for a few minutes; Defendant Dr. Funk then indicated to Plaintiff that he was approving for Plaintiff to go back to see the Neurosurgeon, and for Plaintiff to receive an MRI and X-ray to the right ankle, and then be scheduled to see the Orthopedic Doctor. After making sure that Plaintiff had enough medications for the pain, Defendant Dr. Funk then stated to Plaintiff that he was making the findings/recommendation that Plaintiff was to be moved upstairs tothe 3rd floor of the health care unit as Defendant Dr. Ngu had previously requested. PLaintiff then explained to Defendant Dr. Funk that Plaintiff was on the 2nd floor per Defendant Warden Chandler's orders, yet Defendant Dr. Funk stated that he would still make the recommendation because Plaintiff's condition would be appropriate for 3rd floor placement.

29.     On May 01, 2008, at 6pm, only five hours after Defendant Dr. Funk had diagnosed Plaintiff for "Placement Evaluation" and had concluded that Plaintiff would be appropriately placed on the 3rd floor of the health care unit, he then went and had a staff meeting with "D/W" at which time he recinded the 1pm order of Plaintiff being moved to 3rd floor of health care unit, and made new order that Plaintiff may stay in general population. Yet due tothe fact that the 2nd and 3rd floors of the health care unit are considered general population and that the person instructing Defendant Dr. Funk to change his order knew this fact; they once again had Defendant Dr. Funk change the second order and had him write, that Plaintiff may be moved out of the 2nd floor. It should be noted at this time that the last entry order by Defendant Dr. Funk did not indicate where was Plaintiff to be moved to from the 2nd floor. This could have still meant that Plaintiff was to be moved to the 3rd floor. It should also be noted at this time that the **ONLY** three staff members with whom Defendant Dr. Funk could have met with at 6pm who had the authority to pressure him into making such changes in Plaintiff's

16

medical records are Defendant Henry, Defendant Brauer, and/or Defendant Warden

Chandler. Yet clearly, none of these Defendants are a doctor, so Defendant Dr.Funk

should not have allowed himself to be pressured, persuaded, or convinced by any

of them. (See exhibit A front and back)

30.      On May 02, 2008, the very next morning, Plaintiff was in his assigned

room in the 2nd floor of the health care unit when at approximately 11am, Correctional

Officer Sheridan opened Plaintiff's room door and instructed Plaintiff to pack

up his belongings because Plaintiff was being moved outside of the health care

unit to Housing Unit 26. When Plaintiff requested to speak with a leutenant to

see if he could speak with a doctor to make sure the move was not a mistake, a

little while later Lt. Sambdman (sic) arrived and he indicated to Plaintiff that

Plaintiff was being moved per orders of Defendant Henry. Plaintiff attempted to

explain to the leutenant that the previous day Defendant Dr. Funk had told Plaintiff

about moving him to the 3rd floor; the leutenant indicated to Plaintiff that

Defendant Henry had instructed Defendant Dr. Funk to make the change in Plaintiff's

records. At that time, Plaintiff was ordered to get all his belongings and leave

the health care unit immediately.

31.      On May 05, 2008, at approximately 10:55am, Plaintiff had the opportunity

to speak with Defendant Warden Chandler, and asked her why was Plaintiff moved

from the health care unit. Defendant Warden Chandler seemed surprised to see Plaintiff

in housing unit 26, and she stated that she had no knowledge that Plaintiff had

been moved. She then indicated to Plaintiff that she was going to look into it

to find out why Plaintiff was moved. Plaintiff informed her that Defendant Dr.

Funk had recommended that Plaintiff be moved to the 3rd floor but that according

to leutenant Sambdman (sic) Defendant Henry had instructed Defendant Dr. Funk

to change his recommendations concerning Plaintiff's move to the 3rd floor.

Plaintiff informed Defendant Warden Chandler of the excruciating severe pain

and could hardly walk, yet was being forced to walk such long distances three times a day for his meals and medications. Defendant Warden Chandler again stated that she would look into it and later get back with Plaintiff. Defendant Warden Chandler indicated to Plaintiff that she was aware that Plaintiff needed a wheelchair for long distance movements in the facility, and that she would give instructions that at Plaintiff's request a wheelchair be brought to him so that Plaintiff could go to any place.

32.    On May 06, 2008, at approximately 2pm, not being provided with a wheelchair for travel, Plaintiff was forced to walk a long distance to and from the health care unit for his medications. While on the way back from receiving his medications, Plaintiff's legs gave up on him due to the excruciating severe pain he was having, and Plaintiff fell to the ground hurting his head and back thereby aggravating the pain to Plaintiff's Lower Back. The escorting officer radioed the van officer who was C/O Bock, and Plaintiff was transported to the health care unit. Upon arriving at the health care unit, they observed Plaintiff crying in severe pain so they had a wheelchair brought and they took Plaintiff inside where he was told to lay down on one of the beds in the infirmary. Plaintiff was crying and in excruciating pain for approximately 4 hours. During that period of time, Plaintiff was at no time seen or examined by no doctor to check the injury to the head and back. At one point, a nurse came into the area and took Plaintiff's vital signs and left again. It wasn't until almost four hours of waiting in pain that at 6pm when the med-line was opened that Plaintiff was able to take his medication. At that very same time, 6pm, the nurse came back into the room and told Plaintiff that no doctor would be seeing him and that Plaintiff was to return to his housing unit. PLaintiff objected due to being in excruciating severe pain now more aggravated due to the fall, and requested to speak to a doctor, the shift commander, or the warden; yet PLaintiff was told that would not happen. Plaintiff then took

a wheelchair, and left the health care unit for fear that he would be sent to
segregation for refusing to follow the last order. Upon returning to the housing
unit, Plaintiff phoneed his family and attorney David Vella, and informed them
of everything that had happened. Plaintiff then asked them to please call
Defendant Warden Chandler the following morning and inform her of everything
that happened to Plaintiff and the fact that a doctor would not examine him.

33.     On May 06, 2008, Plaintiff filed an emergency grievance with Defendant
Warden Chandler as a result of everything that had transpired between the dates
of 05/01/08 through 05/06/08. Defendant Warden Chandler deemed the grievance
not to be an emergency and instructed Plaintiff to submit it through normal manner.
Plaintiff submitted the grievance to his counselor, who in turn responded tothe
grievance a response that had nothing to do with the grieved issue. Plaintiff
then appealed to the grievance officer, Defendant Barnhart, who recommended that
no action be taken on the grievance. Defendant Barnhart indicated in his response
that the Director of Nursing, Defendant Brauer, indicated to his that Plaintiff
was seen and treated according to established protocols. That Plaintiff's medical
file was reviewed by Medical Administrators/Doctors (Defendant Henry) and it
was determined that there was no need for placement within the health care unit.
That if Plaintiff deemed it necessary, he could sign up for sick call. Plaintiff
then appealed to the Administrative Review Board, Defendant Benton. Defendant
Benton denied Plaintiff's appeal on 12/05/08 based on her communications with
Defendants Henry and Brauer instead of conducting a formal hearing where Plaintiff
would have been able to prove to her his allegations by documentation in his
medical files.

34.     On May 07, 2008, after Plaintiff's family and attorney calling the facility
to question as to why was Plaintiff not being allowed to see a doctor after falling,
Plaintiff was called and instructed by his Unit Control Officer that Plaintiff
was to go to the health care unit. Once Plaintiff was called into the doctor's
room, Plaintiff was seen by Defendant Dahiya, who without examining Plantiff's
injuries and refusing to do so, simply told Plaintiff that Plaintiff could use
a wheelchair for long distance movements. Yet, Defendant Dahiya refused to issue
a permit authorizing Plaintiff to use a wheelchair. Therefore, one was not provided.

35.     On May 09, 2008, Plaintiff had the opportunity to speak with Defendant
Chandler in his housing unit while she conducted her rounds. Plaintiff explained
to Defendant Chandler that Plaintiff had fallen and injured himself three days
earlier further aggravating his chronic condition to his back. Plaintiff explained
to Defendant Chandler that he needed to see a doctor due to the serious pain
and injuries caused by the fall, but that he wasn't being seen. That Plaintiff
needed a wheelchair for long distance movements due to the severe excruciating
pain it causes Plaintiff to walk but that one was not being provided; that instead,
Plaintiff was having to walk on his own to the health care unit under severe
pain to get one on his own. Defendant Chandler stated she would look into the matter.

36.     It should be noted at this time that it is the Institutional Rule and
Policy that all inmates who require the use of a wheelchair are to be housed
in the health care unit, 2nd floor, wheelchair accommodation side. Yet, Plaintiff
was moved to a regular housing unit from which Plaintiff is forced to walk an
approximately two blocks each way every time Plaintiff needs to take his medications,
go to the chow hall for meals, and/or go to his job assignment all movements which
are no less than three times a day.

37.     Approximately 15 minutes after speaking with Defendant Chandler, Plaintiff
was picked up at his housing unit by a wheelchair pusher with a wheelchair and

taken to the health care unit where Plaintiff was met by Defendant Henry and Defendant Brauer. Plaintiff explained to both defendants that he needed to see a doctor because of being in excruciating pain following the falling down, and that Plaintiff also had a lump on his head as a result of the fall. Defendants Henry and Brauer both responded immediately stating that Plaintiff would not be seeing a doctor; but that a MEMO would be issued that a wheelchair and pusher needed to be called every time Plaintiff needed to go somewhere.

38.     On May 14, 2008, Plaintiff received a call pass to see a doctor. Upon entering to see the doctor, Plaintiff was met by Defendant Mughall. PLaintiff attempted to explain to Defendant Mughall his medical history and the excruciating pain Plaintiff was suffering especially after falling on 5/06/08. Yet Defendant Mughall immediately interrupted Plaintiff stating that Plaintiff was not there to be seen or treated by him; that Plaintiff was only there to be informed that he, Defendant Mughall, was lowering Plaintiff's pain medication (ULTRAM) from three times a day to two times a day. Plaintiff attempted to explain to Defendant Mughall that Defendant Ngu, the Medical Director had not only prescribed such medication at such doses but that there were other medications Defendant Ngu had prescribed that had run out and needed to be renewed; yet defendant Mughall stated that he was only lowering such medication. Plaintiff explained to Defendant Mughall that if he lowered Plaintiff's medication it would only cause Plaintiff to suffer more severe pain. PLaintiff also attempted to explain to Defendant Mughall that Plaintiff needed to be seen by the Neurosurgeon due to the pain, and to the fact that the Neurosurgeon had requested PLaintiff return after the last visit and it had not happened. Defendant Mughall again insisted that Plaintiff was not there to be seen or treated, and ordered Plaintiff to leave. PLaintiff then asked could he at least inspect the injuries to Plaintiff's head to make sure the lump was not a blood clout; but again defendant Mughall ordered Plaintiff

to leave the room and asked the officer to have Plaintiff leave. The actions
of the above Defendants were in retaliation as a direct effect of Plaintiff
having his family, attorney, and himself complain to not only Defendant Chandler,
but also to State Rep. Linda Holmes' Office. The actions were not only retaliatory
but discrimination was a factor. Inmates with less serious conditions than those
of Plaintiff but with need of a wheelchair were all housed on the 2nd floor of
the health care unit and given the opportunity to not only use a wheelchair but
also use the gym area there where they had access to therapeutic equipment.
The defendants were all fully aware that the doctors at the UIC Chicago Hospital
had all ordered Physical Therapy for Plaintiff's back condition, very limited
walking, MRI to Plaintiff's right Ankle, and to schedule an appointment with
an Orthopedic; yet they all wilfully, deliberately, and maliciously refused to
follow such recommendations thereby exposing Plaintiff to suffer further unnecessary
severe and excruciating pain.

39.     On May 14, 2008, Plaintiff filed a grievance with his counselor. The
counselor, Mr. Lopez, responded that "According to the D.O.N. Mr. Echezarreta's
medical issues have been addressed by multiple physicians." The D.O.N. - Director
of Nursing - is Defendant Brauer. Plaintiff then appealed such response to the
Grievance Officer, Defendant Barnhart, who in turn returned the grievance to
Plaintiff indicating that, "Issue previously grieved."

40.     On May 19, 2008, following the filing of the grievance stated in paragraph
39, Plaintiff was called to the health care unit per Defendant Funk. Upon Plaintiff's
arrival at the health care unit, Defendant Funk ordered Nurse Chatting to take
the wheelchair way from Plaintiff and that Plaintiff was not to leave with it.
PLaintiff complained to Defendant Funk and told him that Plaintiff was under
the impression that he was there to be seen for the injuries sustained on 5/06/08
considering that though previously called to the health care unit at no time

had any doctor yet examined Plaintiff's injuries. At that time, Plaintiff showed
Defendant Funk the bruises to Plaintiff's back and the lump on the head. Defendant
Funk then simply ran his hand over the back of Plaintiff's head, stated that
it was a cyst, and without further examination began to write in Plaintiff's
medical file for approximately 20 minutes. Defendant Funk then turned to Plaintiff
and stated that he was leaning to cancel PLaintiff's appointments with Neurosurgery
and the Pain Services Clinic because that would be too much of a cost and it
still was not going to resolve Plaintiff's condition. That Plaintiff's condition
was a permanent condition and Plaintiff just needed to be a man and learn to
deal with the pain. At that time Plaintiff objected to Defendant Funk's decision
and told him that Plaintiff would be contacting his family and State Representative
for assistance. Immediately, Defendant Funk got up from his seat and ordered
Plaintiff to leave, then turned to the officer and asked him to have Plaintiff
leave. Plaintiff was then forced to walk back to his housing unit without a
wheelchair a distance of approximately two blocks. PLaintiff attempted to complain
to Defendant Henry and Defendant Brauer about Defendant Funk's actions; yet they
refused to take action.

41.     On May 23, 2008, Plaintiff filed a grievance against Defendants Funk,
Henry, and Brauer, under "Staff Conduct" and "Retaliation". PLaintiff's counselor,
Mr. Lopez, responded that, "According to the D.O.N. Mr. Echezarreta's placement
in the health care unit was reviewed by multiple physicians." The D.O.N. is
Director of Nursing Defendant Brauer. PLaintiff appealed the grievance to the
Grievance Officer, Defendant Barnhart. In the appeal, grievant informed Defendant
Barnhart that when considering Defendant Brauer's response that placement in
the health care unit was reviewed by multiple physicians; it should be noted
that not only had Defendant Ngu ordered/recommended that Plaintiff be placed/housed
in the health care unit, but that Defendant Funk himself had made the same order/

recommendation prior to meeting with Defendant Brauer. Defendant Barnhart refused to address the grievance, and returned it to Plaintiff indicating that the "Issue previously grieved." PLaintiff appealed to the Administrative Review Board, yet they never responded due to Issue previously grieved.

42.     On May 23, 2008, Plaintiff spoke to Defendant Chandler at 8:45pm, in his housing unit while she did her rounds. Defendant Chandler saw Plaintiff crying due to the excruciating pain PLaintiff was in. PLaintiff showed Defendant Chandler a copy of the notes made by Defendant Funk in PLaintiff's medical file on 5/1/08 where Defendant Funk had recommended Plaintiff was appropriately placed in the health care unit and to move to 3rd floor. Plaintiff also informed her that Defendant Funk had the wheelchair taken from Plaintiff and she could see how much pain Plaintiff was in so imagine how much more when forced to walk long distances. Defendant Chandler indicated that she would talk to Defendant Funk.

43.     On May 24, 2008, PLaintiff was called to the Control Booth in his housing unit by male staff officer Johnson at 8:40am. At that time, officer Johnson informed Plaintiff that Lt. McKeel had called and stated that, per Defendant Chandler, it was her order that Plaintiff was to use a wheelchair for all movement outside the housing unit. That the Control Officer assigned to the Unit was to call for a wheelchair and pusher  any time Plaintiff had a call pass or needed to go to any other location. That if Plaintiff did not use a wheelchair, an Incident Report was to be written.

44.     On June 09, 2008, Plaintiff was writ to UIC Hospital Neurosurgery Clinic for a follow up. This follow-up was from a request that the Neurosurgeon had made in 02/22/08 that Plaintiff needed a new MRI, and to return to see him right after the MRI appointment. The MRI was done on 3/14/08. The Neurosurgeon indicated that Plaintiff would not need to undergo surgery, but needed to continue to get Epidural Injections for the pain. During the 02/22/08 visit to the Neurosurgeon,

24

the doctor recommended that Plaintiff not only get an MRI to the back, but also to the right ankle. Yet this was not done.

45.     On June 12, 2008, Plaintiff was writ to UIC Hospital Pain Clinic for Epidural Injections. During this visit, Plaintiff received an Epidural Injection, and the doctor there ordered that Plaintiff receive Physical Therapy and return to the Pain Clinic for additional Injection in four weeks. The doctor further ordered/recommended that Plaintiff was not to walk long distances, but to have less walking.

46.     Following the Epidural Injection in paragraph 45, and for the five weeks, Plaintiff signed up for sick call so that he could see a doctor due to the ongoing severe excruciating pain to his right ankle and to inquire about the physical therapy to the back. Yet none of the requests to sick call were being honored.

47.     On July 21, 2008, PLaintiff spoke with his counselor, Mr. Lopez, and informed him that Plaintiff was not being called to sick call in spite on Plaintiff signing up almost on a daily basis since the second week of June. Counselor Mr. Lopez called the health care unit and spoke with Nurse Heffalina (sic) asking her why was Plaintiff not being called to sick call or being seen by a doctor. Counselor Lopez indicated to Plaintiff that Nurse Heffalina (sic) was stating that it was because Plaintiff was requesting to see only Defendant Mesrobian. PLaintiff assured counselor Lopez that was false and in turn he informed Nurse Heffalina that was false and that Plaintiff was willing to see any doctor. He further indicated to Nurse Heffalina (sic) that Plaintiff was in serious pain. Counselor Lopez then asked Nurse Heffalina (sic) what was going on regarding Plaintiff receiving physical therapy. Counselor Lopez then informed Plaintiff that per Nurse Heffalina (sic), Plaintiff was scheduled to go out and receive the therapy.

48.     On July 23, 2008, Plaintiff was called to sick call. After explaining

to the Nurse at sick call everything that had been ordered/recommended by the doctor at UIC Hospital Pain Clinic, the Nurse indicated that she would schedule Plaintiff to be seen by a doctor. While Plaintiff was still there with the Nurse at sick call, Nurse Heffalina walked into the room and indicated to Plaintiff that she had looked inside Plaintiff's file and that Plaintiff was scheduled to go out for physical therapy.

49.     On August 11, 2008, Plaintiff went to sick call due to being in severe pain and still had not seen a doctor since his last visit to UIC Hospital in 6/12/08. At sick call, the attending nurse, Nurse Fitshue (sic), refused to take notes or attend to Plaintiff's concerns unless Plaintiff first signed a Money Voucher authorizing for the withdrawal of $2.00 from PLaintiff's account. When Plaintiff refused to sign the voucher indicating that his visit was a follow-up to other prior request to see a doctor which had yet not happened, Nurse Fitshue got up and ordered Plaintiff to then sign a refusal form stating that Plaintiff refused treatment. Plaintiff signed the refusal form, yet indicated on it that he was signing under threat and coersion.

50.     On August 12, 2008, the very next morning, Plaintiff had the opportunity to see and speak with Defendant Chandler while at the prison law library. Plaintiff informed Defendant Chandler of what Nurse Fitshue (sic) had done to Plaintiff the previous day at sick call, and that Plaintiff had not seen a doctor in two months dinspite of numerous request and orders from doctors at UIC Hospital that were not being followed. Defendant Chandler went to a phone and called the health care unit concerning the matter. When she hung up the phone, she assured Plaintiff that he would be call to the health care unit the following morning.

51.     On August 13, 2008, Plaintiff was called to sick call where he explained his complaints and UIc doctors' orders. Plaintiff explained to the nurse that

Plaintiff was in serios excruciating pain to the right ankle and lower back,
and that he needed to see a doctor. The nurse stated that she would schedule
Plaintiff to see a doctor.

52.     On August 14, 2008, Plaintiff was finally able to see a doctor, the
Defendant Dr. Mesrobian. PLaintiff explained to Defendant Mesrobian everything
that had happened up to that point concerning PLaintiff's medical history, and
the severe excruciating pain and suffering Plaintiff was under. Defendant Dr.
Mesrobian then indicated to Plaintiff that Defendant Dr. Funk was his boss and
had given him instructions concerning PLaintiff's treatment. Defendant Dr. Mesrobian
further indicated that he could not override Defendant Dr. Funk's instructions
nor reorder some of the medication that had previously been ordered by Defendant
Dr. Ngu. That the only thing he would renew was the Ultram, which is a pain
medication. Defendant Dr. Mesrobian also added that he would order the Physical
Therapy as ordered/recommended by the UIC doctors. Plaintiff attempted to obtain
an answer from Defendant Dr. Mesrobian regarding the MRI tothe right ankle or
visit to the Orthopedic as ordered/recommended by the doctors at UIC Hospital;
yet Defendant Dr. Mesrobian stated that he was not going to address anything
about the ankle at that time.

53.     On September 10, 2008, almost a month after seeing Defendant Dr. Mesrobian,
PLaintiff went again to sick call to inquire about when would Plaintiff be going
to Physical Therapy, when would Plaintiff be returning to UIC Pain Clinic since
they said Plaintiff was to return in four weeks and three months had already
passed, and to renew his pain medication. Nurse Dale, the attending nurse,
indicated to Plaintiff that he was going to schedule Plaintiff to see a doctor.

54.     On September 25, 2008, PLaintiff went to the health care unit for an
appointment. Plaintiff was seen Defendant Dr. Shute. Plaintiff made an attempt
to explain to this Defendant the excruciating pain and suffering Plaintiff

was in, that Plaintiff wanted to know when would he be going to physical therapy considering that it had previously been ordered, and why had Plaintiff not been schduled to return to the Pain Clinic at UIC Hospital considering they had requested Plaintiff return in four weeks and 12 weeks had already passed. Defendant Dr. Shute responded that there was nothing he could do for Plaintiff. Defendant Dr. Shute then stated that per Defendant Dr .Funk, he was to only call Plaintiff in for a consultation, log it in the record that he had seen Plaintiff, and not to order anything for Plaintiff. Defendant Dr. Shute then stated that he needed to follow the instructions.

55.    On October 16, 2008, PLaintiff was able to obtain an appointment to see Defendant Dr. Funk. Yet, after waiting to see him for almost two hours, the moment Defendant Dr. Funk saw Plaintiff in the waiting room, he instructed the nurse to cancel Plaintiff's appointment. Plaintiff was then ordered to leave.

56.    On October 21, 2008, Plaintiff's father contacted Defendant Chandler concerning Defendant Dr. Funk's deliberate Indifference to Plaintiff's serious medical needs; and cancelling Plaintiff's appointment on the 16th.

57.    On October 23, 2008, Plaintiff had an appointment to see Defendant Dr. Funk. At this appointment, Plaintiff attempted to explain to Defendant Dr. Funk the fact that Plaintiff is under excruciating pain and suffering from his Lower Back and Right Ankle, and that Plaintiff needs treatment. Plaintiff attempted to get an answer from Defendant Dr. Funk as to his reason for instructing other doctors not to adequately treat Plaintiff, but he would not state a reason. Defendant Dr. Funk did admit receiving a call from someone on Plaintiff's behalf and that he was not comfortable about it. PLaintiff then indicated to Defendant Dr. Funk that if he did not like receiving calls from Plaintiff's family, attorney, or State Representative on Plaintiff's

28

behalf that then he should do the professional job he swore an oath to perform, and give Plaintiff proper medical care. At that time, Defendant Dr. Funk then asked Plaintiff to remove his right shoe and sock, and he examined Plaintiff's right foot. Defendant Dr. Funk then indicated that Plaintiff possibly had Tendonnitis (sic) or a torn *** (plaintiff couldn't understand the word he used. Defendant Dr. Funk then wrote some things in Plaintiff's medical file, and then indicated to Plaintiff that he was going to order physical therapy, and for Plaintiff to return to UIC Hospital Pain Clinic for the Back.

58.    In between all the doctors visits, Plaintiff has signed up for sick call on a number of occasions; sometimes being called and not on others. Yet, on the times that Plaintiff was called, Plaintiff informed the attending nurse about the previous doctor's orders for physical therapy, orthopedic surgeon, and Pain Clinic. During those visits, Plaintiff was always told by the attendind nurse that he/she would informed their supervisor, Director of Nursing Defendant Brauer, and have her schedule Plaintiff according to the orders. The attending nurses would also indicate to Plaintiff that they would schedule Plaintiff to see a doctor again due to the orders not being followed through.

59.    On December 10, 2008, PLaintiff had an appointment to see a doctor, Defendant Dr. Appleyard. During this appointment, Plaintiff informed Defendant Dr. Appleyard of Plaintiff's medical conditions to the Lower Back and Right Ankle. PLaintiff further explained to him that other doctors had previously ordered that Plaintiff receive physical therapy, be seen by Orthopedic Doctor, return to UIC Pain Clinic to Back condition, and even that the Neurosurgeon had recommended an MRI to Plaintiff's right ankle. Following, Defendant Dr. Appleyard responded that Defendant Dr. Funk had already discussed Plaintiff's case with him, and that it simply was not going to happen because the cost was too high. That only the transportation to UIC Hospital with gas and guard

expenses was around $3,500.00, without counting the UIC Hospital and Doctors'
expenses. Plaintiff told Defendant Dr. Appleyard that Plaintiff did not care
anything about any cost, that the only thing Plaintiff was concerned with
was his medical condition and receiving the needed treatment and possibly
being cured; and not having to suffer such severe excruciating pain. Defendant
Dr. Appleyard then simply grabbed Plaintiff's medical file, renewed the pain
medication (ULTRAM), and said Plaintiff could leave that he was done. At no
time during this entire visit did Defendant Dr .Appleyard even once examine
PLaintiff's Back, Right Ankle, or any other body area for that matter.

60.    On December 12, 2008, Plaintiff filed an emergency grievance with
Defendant Warden Chandler. Defendant Warden Chandler deemed the grievance
issue not to be an emergency, and returned it to Plaintiff. PLaintiff then
sent it to his counselor, Mr. Cameron, who in turn answered, "Dr. Funk
recommended pain clinic to evaluate, but made no referal which stopped the
process. Dr Mesrobian will approve and follow up after his return on 1/05/09.
Also will be on line to discuss questions & physical therapy evaluation."
Following the counselor's response, Plaintiff appealed the grievance to the
grievance officer, Defendant Martens, explaining and breaking down every issue
raised. Defendant Martens denied Plaintiff's grievance. and Defednant Warden
Chandler concurred with the decision. Plaintiff then appealed such decision
to the Administrative Review Board, where Defendant Benton denied the grievance
and Defendant Walker concurred with the denial.

61.    On January 12, 2009, Plaintiff had an appointment with Defendant Dr.
Mesrobian. After Plaintiff explaining to Defendant Dr. Mesrobian everything
concerning Plaintiff's medical conditions and the previously ordered things
that had still not been done; Defendant Dr. Mesrobian stated to Plaintiff
that he was not going to look at or order anything concerning Plaintiff's
feet or right ankle. Yet after seeing Plaintiff crying in severe pain, he

indicated to Plaintiff that he would order the Pain Clinic for an Epidural
Injection to the Back.

62.  On January 27, 2009, Plaintiff sent a letter to the Health Care UNit
Administrator, Defendant Palmer, requesting a meeting to discuss Plaintiff's
medical needs and the fact that in spite of doctors ordering certain treatment,
Plaintiff is not receiving it or being scheduled for it. This letter was
to no avail due to the fact that Defendant Palmer never responded to it nor
scheduled a meeting with Plaintiff.

63.  On February 05, 2009, eight months after the last visit to UIC Hospital
Pain Clinic and in spite of the doctors requesting that Plaintiff return
in four weeks, Plaintiff was writ to UIC Hospital Pain Clinic for an Epidural
Injection for the Back condition. After receiving the Injection, the doctor
at UIC Hospital Pain Clinic informed Plaintiff that they were recommending/
ordering that Plaintiff receive physical therapy for the Back, and to be
seen by an Orthopedic Surgeon for the Right Ankle. Also, that Plaintiff was
to return to the Pain Clinic in six weeks.

64.  On February 15, 2009, Plaintiff sent a second letter to Defendant Palmer
requesting a meeting to discuss the failure of her doctors to follow the
recommended orders by the Specialist Doctors at UIC Hospital concerning Plaintiff's
treatment.

65.  On February 20, 2009, approximately three years since the date that
the doctors at UIC Hospital Neurosurgery and Pain Clinic Department originally
began recommending/ordering that Plaintiff receive physical therapy; Plaintiff
was finally scheduled for and began to receive physical therapy. It should
be noted at this time that the prison facility health care unit had had a
physical therapist on site since approximately six months earlier.

66.  On February 23, 2009, Plaintiff had his right ankle examined by the

physical therapist. At that time, the physical therapist indicated to Plaintiff that due to the tenderness of the area, it was possible that Plaintiff could have a torn ligament; but that only an MRI could truly reveal the issue.

67.   On February 25, 2009, Plaintiff sent a third letter to Defendant Palmer again requesting a meeting with her to discuss Plaintiff medical issues.

68.   On February 26, 2009, Plaintiff had an opportunity to see Defendant Palmer with he was in a physical therapy session. At that time, Plaintiff explained to Defendant Palmer everything related to his medical condition, and everything that the doctors at UIC Hospital and other doctors at the facility had previously order but that PLaintiff was not receiving such treatments. Plaintiff further explained to her what the physical therapist had told Plaintiff concerning the right ankle, and the physical therapist himself explained it to her. Defendant Palmer then stated that she would review Plaintiff's medical file, and get back with Plaintiff.

69.   On or about March 3, 2009, the physical therapist order/recommended that Plaintiff be issues an Ankle Brace to stabalize Plaintiff's right ankle.

70.   On or about March 09, 2009, the physical therapist again ordered/recommended that Plaintiff be issued an Ankle Brace for the right ankle.

71.   On March 13, 2009, Plaintiff had an appointment to see Defendant Funk. Prior to entering the health care unit, Plaintiff had an opportunity to see and speak with Assistant Warden Dusing in the lobby. There, A/W Dusing indicated to Plaintiff that he had spoken with Plaintiff's friend, Ms. Diana Rodriguez, that morning concerning Plaintiff's medical treatment, and that he had made the call for Plaintiff to be seen by Defendant Dr. Funk at that appointment.

72.   After speaking to A/W Dusing, Plaintiff proceeding to the appointment to see Defendant Dr. Funk. Upon entering the examination room, Defendant

Dr. Funk immediately addressed Plaintiff stating that he was not going to order the ankle brace and arch supports that the physical therapist had recommended/ordered; and nor was he going to sign off for Plaintiff to be seen by an Orthopedic doctor or to receive orthopedic shoes.

73.    On March 20, 2009, PLaintiff was able to see and speak with the Director or Nursing, Defendant Brauer, during his physical therapy session. At that time, Plaintiff asked the physical therapist to explain to Defendant Brauer about his recommendation/order for Plaintiff to receive an Ankle Brace and Orthodics (arch supports). The physical therapist did explain the order to Defendant Brauer, and she stated that she would look into it to have it ordered.

74.    On April 09, 2009, Plaintiff was writ to UIC Hospital Pain Clinic for an Epidural Injection to the Back. At thatr time, the attending doctor saw Plaintiff's difficulty in walking and in pain, and mentioned to Plaintiff that they were going to recommend/order an MRI to PLaintiff's right ankle.

75.    On May 08, 2009, Plaintiff was writ to UIC Hospital MRI Department. Yet during this visit to the MRI Department, Defendant Dr. Mesrobian requested the MRI for Plaintiff's Back in stead of Plaintiff's right ankle.

76.    On May 15, 2009, Plaintiff had an appointment to see Defendant Dr. Mesrobian as a follow-up to the medical writ. During this visit, Plaintiff informed Defendant Dr. Mesrobian that the doctors at UIC Hospital were ordering an MRI to Plaintiff's right ankle, not the Back, yet the MRI was taken of Plaintiff's Back. At that time, Defendant Dr. Mesrobian stated that he had made a mistake in the orders; but that he would try to correct it. Defendant Dr .Mesrobian then said he would renew Plaintiff's medication for the Back, and would schedule Plaintiff to return in one week concerning PLaintiff's ankle.

77.    On May 21, 2009, Plaintiff had an appointment to see Defendant Dr.

Mesrobian concerning PLaintiff's right ankle. During this visit, Plaintiff ask Defendant Dr. Mesrobian for a reason as to why is it that for four years a number of doctors have been requesting that Plaintiff receive an MRI tothe right ankle; that Plaintiff be seen by an Orthopedic doctor/surgeon; and that PLaintiff be provided with insole orthotics, medical custom shoes, and an ankle brace; yet none of these recommendations/orders were being followed. At that time, Defendant Dr. Mesrobian stated that he would review Plaintiff's medical file and that he would approve a visit to the Ortho Clinic. With regards to the ankle brace and orthotic that the Physical Therapist had been ordering since March 2009, Defendant Dr. Mesrobian indicated that he was not going to sign off on them because Plaintiff needed to adapt and learn to deal with pain.

78.    On May 26, 2009, PLaintiff was writ to UIC Hospital Orthopedic Clinic to been seen by an Orthopedic Surgeon. During this visit, the attending doctor ordered/recommended that Plaintiff receive an MRI tothe Right Ankle. The doctor informed Plaintiff that Plaintiff has plantar fasiatis (sic) and needs the have custom orthotic and shoes molded. Plaintiff informed the doctor that it had previously been diagnosed and ordered by other doctors, but that the prison doctors were not honoring such recommendations/orders. The doctor stated that once he reviewed an MRI of Plaintiff's right ankle, he would then make the necessary recommendations and orders; and would contact the prison doctor by phone if necessary to assure that Plaintiff receive anything that was ordered/ recommended.

79.    On June 05, 2009, Plaintiff had an appointment with Defendant Dr. Mesrobian as a follow-up to the medical writ. During this visit, Plaintiff explained to Defendant Dr. Mesrobian everything that the Orthodepic doctor had said to Plaintiff and about the order of an MRI to the right ankle.

34

After reviewing the notes from the Orthopedic doctor, Defendant Dr. Mesrobian then indicated to Plaintiff that he would order the MRI to PLaintiff's right ankle.

80. On July 06, 2009, as a result of being in severe and excruciating pain to the Back and Right Ankle, Plaintiff went to sick call to request to see a doctor. During this sick call visit, the attending nurse, Nurse Rita, stated that Defendant Dr. Mesrobian was on vacation at the time and there were orders that only he could see/attend Plaintiff. She then said that she would make a note for Defendant Dr. Mesrobian to see Plaintiff after he returned from vacation. When Plaintiff asked to be able to see any doctor due to the severe pain, he was ordered to leave immediately or he would be taken to segregation.

81. On July 22, 2009, Plaintiff was writ to UIC Hospital MRI Department for an MRI to the Right Ankle. PLease take note that this is done over four years since the accident to Plaintiff's right foot & ankle; and over four years since it was first recommended/ordered that Plaintiff receive an MRI to the right ankle or be seen by an Orthopedic doctor. Meanwhile, for over four years, Plaintiff has suffered severe excruciating pain to the right fot and ankle.

82. On July 23, 2009, Plaintiff had an appointment with Defendant Dr. Mesrobian as a follow-up to the medical writ. During this visit, Defendant Dr. Mesrobian reviewed Plaintiff's MRI to the right ankle. He then turn to Plaintiff, and stated, "I don't know why you complaining so much. The MRI shows nothing wrong with your foot or ankle. You need to stop winning and complaing about everything." Defendant Dr. Mesrobian then stated that Plaintiff was scheduled to see the Ortho doctor as a follow-up with the MRI for review.

83. On August 04, 2009, Plaintiff was writ to UIC Hospital Orthopedic Clinic to see the Ortho doctor. During this visit, the attending doctor informed

PLaintiff that according to the MRI Report, Plaintiff had a **7millimeter bone fragment** that was lodged under the subtibial joint and that surgery was necessary to remove the fragment, yet they needed to make sure that removing it would not cause further permanent damage. The Orthopedic doctor further informed Plaintiff that once they addressed the fragment bone issue, they then also needed to mold Plaintiff's feet to make custom-made orthodics and orthopedic shoes. The doctor then ordered that Plaintiff be issued an Upright Ankle Brace to stabalize Plaintiff's right ankle until they determined about the surgery. The doctor further indicated to Plaintiff that Plaintiff was to return in one week. At that time, a female doctor came into the room and was about to install a Brace on Plaintiff's right ankle when the escorting officer noticed that the Brace had several metal brackets and told her that Plaintiff could not have such a Brace inthe prison. At that time, the female doctor left the room, and then returned with a cloth ankle brace. She indicated that she was going to give this cloth brace to Plaintiff as a temporary brace until the following week and that when Plaintiff returned in a week they would do a custom brace without any metal parts. The problem is that Plaintiff did not return until five months later because Defendants Dr. Mesrobian, Dr. Funk, and Nurse Allen did not have Plaintiff schedule to return as requested by the UIC Orthopedic Doctor.

84.    On August 06, 2009, Plaintiff filed a grievance concerning Plaintiff's Right Ankle, and the fact that for over four years Plaintiff continually complained about severe & excruciating pain to the right ankle following an injury in 2005, and the doctors always stating that there was nothing wrong with Plaintiff's ankle...that the pain was due to the Back condition; only to find out over four years later following an MRI that Plaintiff in fact has a 7 millimeter bone fragment lodge between the subtibial joint.

Throughout PLaintiff's grievance, PLaintiff complained of the fact that in
spite of several doctors throughout the years requesting that Plaintiff receive
an MRI and be seen by an Orthopedic doctor, it was not done until over four
years later only to find out that Plaintiff indeed had a broken bone fragment.
Plaintiff clearly stated that he was aware of this bone fragment due to the
MRI that was done on 07/22/09. At no time in this grievance did Plaintiff
ever request an MRI due to it having been done already. Yet, clearly demonstrating
that Defendant Nurse Allen didn't take the time to properly read Plaintiff's
grievance; Defendant Nurse Allen responded to the grievance stating that
there was no indication in Plaintiff's medical chart that an MRI is required.
Again, Plaintiff never indicated that an MRI was required. Further, Defendant
Nurse Allen stated that documentation indicates that physical therapy and
Plaintiff's brace is working. The problem with this response from Defendant
Nurse Allen is that such statement is false. First, Plaintiff never returned
to UIC Hospital to receive the necessary Brace. PLaintiff was using the temporary
Brace provided at UIC Hospital, ye tthe physical Therapist indicated to Plaintiff
that he was documenting it in Plaintiff's chart that the cloth brace was
not working, it was not adequate to produce stability, and that Plaintiff
needed an Upright Ankle Brace for proper stability and support. As for the
physical therapy working, such indications were regarding Plaintiff's Back
condition, not his ankle. PLaintiff then appealed the grievance to the Grievance
Officer, Defendant Martens. Defendant Martens responded to Plaintiff's grievance
stating the same response that Defendant Nurse Allen had stated, and amongst
other things, that Plaintiff had access to the health care unit, and that
Plaintiff did not agree with the treatment rendered. Yes, Plaintiff did have
access to the health care unit and to see doctors. Yet the problem is that
for four years these doctors were deliberate indifferent to Plaintiff's medical
needs concerning Plaintiff's right ankle. No treatment was ever done. Plaintiff

never has nor ever will request preferential treatment of any sorts. Plaintiff simply has requested to receive adequate and appropriate medical treatment at par with the minimum medical treatment that is required to treat any given condition and that meets the minimum standard that is provided to society and the public. Following Defendant Martens' response to PLaintiff's appeal, PLaintiff appealed to the Administrative Review Board.

85.     On August 11, 2009, PLaintiff was writ to UIC Hospital, Neurosurgery Clinic for the Back condition. During this visit, the Neurosurgeon indicated that apparently the Epidural Injections and Physical Therapy were working because the MRI showed some improvements. As a result, he further stated that he recommended no surgery at this time, but that PLaintiff was to continue with physical therapy and return for other Epidural Injections.

86.     On August 19, 2009, Plaintiff had an appointment with Defendant Dr. Mesrobian as a follow up to the medical writ to UIC Hospital. After a brief discussion, Defendant Dr. Mesrobian stated to Plaintiff that he was aware that the cloth brace UIC Ortho gave Plaintiff on 8/04/09 is a temporary brace until they can get Plaintiff an "Air Cast Brace"; but that he was not going to order an Air Cast, that Plaintiff could wait until he returned to the Ortho Clinic to receive one. PLaintiff was then orderd to leave.

87.     On September 04, 2009, Plaintiff had an opportunity to speak with Defendant Palmer while at a physical therapy session. Plaintiff explained to Defendant Palmer everything the orthopedic doctors at UIC Hospital said to Plaintiff concerning Plaintiff's right ankle and the immediate need for an Upright Aircast Brace until Plaintiff returns to the Clinic for further treatment. PLaintiff also informed Defendant Palmer about what Defendant Dr. Mesrobian had said to Plaintiff of him not going to order any brace. At the same time, the physical therapist also explained to Defendant Palmer

of the fact that Plaintiff needed an Upright Ankle Brace, and that he had been ordering/recommending one be provided since March 2009, for over six months, yet to no avail. Defendant Palmer then stated that she would look into it and get back with Plaintiff. This she failed to do by not contacting PLaintiff.

88.     On September 11, 2009, a week after Plaintiff and the physical therapist had spoken to Defendant Palmer, Plaintiff once again had the opportunity to speak with Defendant Palmer while at another physical therapy session. At that time, Plaintiff asked Defendant Palmer had she been able to look into what Plaintiff and the physical therapist had addressed with her the previous week regarding Plaintiff's right ankle and the brace, or about PLaintiff's appointment to return to UIC Hospital Orthopedic Clinic. Defendant Palmer responded that she was very busy and had not had time to be looking into PLaintiff's concerns; that if she found some time she would look into it later. Defendant Palmer then walked out of the room.

89.     On September 16, 2009, PLaintiff spoke to Defendant O'Neil in the housing unit, and explained to Defendant O'Neil that Plaintiff was under serious pain and suffering to the right ankle and the lower Back. PLaintiff further explained to him that Defendant Dr. Mesrobian was refusing to order an Aircast Brace that the orthopedic doctors at UIC Hospital had requested, and that he was not shceduling Plaintiff to return in spite of the orthopedic doctors requesting that Plaintiff return in a week. Also, Plaintiff informed Defendant O'Neil of the fact that Defendant Palmer was fully aware of the matter, yet was failing to intervine or do anything about it. Defendant O'Neil then asked Plaintiff to send him a kite (letter) detailing everything, and stated he would then look into the matter.

90.     On September 16, 2009, Plaintiff wrote and sent Defendant O'Neil a letter detailing all of Plaintiff's concerns.

39

91.    On September 19, 2009, Plaintiff went to sick call due to being
in serious pain and suffering to the Back and right ankle. At that time,
Plaintiff requested to be scheduled to see a doctor and inquired about the
UIC Hospital Orthopedic Clinic appointment. The attending nurse indicated
that Plaintiff would be scheduled.

92.    On October 02, 2009, since two weeks had passed and PLaintiff had
still not seen a doctor and was in serious pain and suffering, PLanitiff
again returned to sick call. During this visit, PLaintiff was informed by
the attending nurse, Nurse Johnson, that per Cathy, PLaintiff was not scheduled
to return to UIC Hospital. That she would schedule Plaintiff to see a doctor
but that it probably wouldn't happen for at least another couple of weeks.
At that time, Plaintiff informed nurse Johnson that PLaintiff was going
to speak with the Warden, Defendant Chandler, and also ask his family to
contact the Administration in Springfield because PLaintiff was in too much
pain and he couldn't keep waiting while they played their games. PLaintiff
then left and returned to his unit. Approximately two hours later, Plaintiff
was called to the Officer's Control Booth where he was informed by C/O Bock
that the health care unit had just called and asked that she tell Plaintiff
that they had scheduled PLaintiff to return to UIC Hospital Ortho Clinic
on December 08, 2009. This was more than four months since Plaintiff's last
visit to the orthopedic doctors when they had requested that Plaintiff return
a week later. Meanwhile, Plaintiff was still not being provided with an
Upright Ankle Brace.

93.    On October 08, 2009, Plaintiff was scheduled to see a doctor by
the name of Dr. Headlam. Once Plaintiff entered the examination room and
explained to Dr. Headlam Plaintiff's medical issues, Dr. Headlam responded
that he didn't have Plaintiff's file with him and that he needed t o

reschedule Plaintiff to return later. PLaintiff insisted that he was in
serious pain and suffering, and Dr. Headlum stated that he would renew Plaintiff's
medication for the pain.

94.     On October 23, 2009, Plaintiff had an opportunity to speak with
Defednant Chandler in his housing unit. At that time, Defendant Chandler
saw Plaintiff in a lot of pain and suffering, and noticed that Plaintiff
still did not have the Upright Ankle Brace that the UIC doctors had ordered/
recommended that Plaintiff have. PLaintiff then explained to Defendant Chandler
everything that the orthopedic doctors at UIC Hospital had said, and also
Defendants' Mesrobian, Palmer, and O'Neil's responses to PLaintiff's serious
medical needs. Defendant Chandler then stated that she would contact and
speak with Defendant Mesrobian, Defendant Palmer, and the physical therapist
on the following morning to address the Ankle Brace and UIC Hospital appointment,
and she would have Defendant Palmer contact Plaintiff to give a answer to
the matter.

95.     On October 30, 2009, Plaintiff saw and spoke to Defendant Palmer
while at a physical therapy session. At that time, Defendant Palmer stated
she was very aware of the fact that UIC Ortho and the physical therapist
had ordered Upright Ankle Brace for Plaintiff, and aware that Plaintiff needed
such a Brace; but that she could not force Defendant Mesrobian into signing
off the approval for such a Brace. She stated that she would be e-mailing
Defendant Chandler to inform her that the physical therapist was only in
til 12 noon so that Defendant Chandler could come to the health care unit
and speak directly with the therapist, and then Defendant Dr. Mesrobian.

96.     On November 02, 2009, Plaintiff had an appointment with a doctor,
Dr. Albers. At approximately 9:30am, Plaintiff entered to see Dr. Albers,
and after examining Plaintiff and reviewing Plaintiff's medical file, Dr.
Albers turned and informed Plaintiff that he was ordering Plaintiff an Upright

41

Ankle Brace. At approximately 3pm, Defendant Chandler opened and entered Plaintiff's cell, and informed Plaintiff that she had spoken to Ms. Sheiffer (sic) in the morning and she was ordering the brace for Plaintiff's right ankle.

97.    On November 06, 2009, Plaintiff was at a physical therapy session when Ms. Sheiffer (sic) walked in and informed Plaintiff that she would now be ordering the ankle brace since Defendant Dr. Funk had finally signed off on the order.

98.    On December 04, 2009, Plaintiff was at a physical therapy session when Ms. Sheiffer (sic) walked in and issued a ankle brace to Plaintiff. It should be noted at this time that this brace was issued five months after it was originally recommended/ordered by UIC Orthopedic doctors; and also that it was a wrong ankle brace.

99.    On December 08, 2009, five months since Plaintiff's last visit to UIC Hospital Orthopedic Clinic, Plaintiff was writ to UIC Hospital Orthopedic Clinic concerning his right ankle. During this visit, Plaintiff was seen by two orthopedic surgeons who examined Plaintiff's MRI, and they indicated that they would like to have an CT Scan Image of Plaintiff's right foot and ankle before determining if they could do the surgery to remove the fragment bone without causing any further damage to Plaintiff's ankle. These doctors then recommended/ordered that Plaintiff receive an CT Scan of the right foot and ankle and to return to their Clinic within a month. Also, one of the doctors noticed that the ankle brace Plaintiff was wearing was the wrong and incorrect brace and that Plaintiff needed an AIR CAST ANKLE BRACE. This doctor indicated that he would be contacting the prison doctor and informing him/her that the current brace was a wrong one and the one Plaintiff needs, would be an Air Cast Ankle Brace.

100.    On December 09, 2009, Plaintiff had an appointment with Dr. Wahl as a follow-up to the medical writ. During this visit, Dr. Wahl informed Plaintiff that she would do the paperwork so that Plaintiff could receive a CT Scan to the right foot & ankle, and she would also request an AIR CaST BRACE. She then

asked Plaintiff to remove the ankle brace Plaintiff was wearing since it was an
incorrect brace, and indicated that the correct brace would be provided within
a week.

101.    On December 21, 2009, Plaintiff went to sick call to request his medication
be renewed, complain about being in severe pain to the Back and Right Ankle,
and inquire about the replacement of the ankle brace.

102.    On December 30, 2009, Plaintiff went to sick call again due to still
not having the ankle brace or medications renewed. Also, to complain about the
severe pain Plaintiff was in and the medication dosage not being enough to bring
down the pain. At this visit, Nurse Dale took Plaintiff's medical records chart
to Dr. Wahl and she renewed Plaintiff's medication; yet indicated that Plaintiff
needed to see another doctor.

103.    On January 04, 2010, Plaintiff had an appointment to see Dr. Wahl.
At this appointment, Dr. Wahl stated that she was only examining Plaintiff's
right hand due to a pinched nerve; but that Plaintiff needed to return to sick
call and ask the Nurse there to schedule Plaintiff to see another doctor for
the Back and Ankle issues because she was working at Dixon C.C. no longer and
Plaintiff needed to address his issues to the next doctor. Plaintiff asked her
could she at least inquire about the right ankle brace order, yet she responded
that it was no longer in her hands.

104.    On January 14, 2010, over a month since Plaintiff's visit to UIC Hospital
Orthopedic doctors, and they recommending/ordering that Plaintiff receive a
CT Scan and correct Air Cast Ankle Brace, Plaintiff was able to see a Dr. Carter.
At this visit, Dr. Carter explained that he would order the CT Scan and Air
Cast Ankle Brace.

105.    Upon exiting the room with Dr. Carter, Plaintiff saw and spoke with
Defendant Allen. Plaintiff again informed her that he still did not have an
Air Cast Brace, orthodics, or orthopedic shoes as previously ordered. Defendant
Allen once again stated that she would look into it.